Exhibit 12

N2O5eisA

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MANGO LABS, LLC,

4                    Plaintiff,              New York, N.Y.

5              v.                            23 Civ. 665 (LJL)

6    AVRAHAM EISENBERG,

7                    Defendant.

8    ------------------------------x

9                                            February 24, 2023
                                             10:45 a.m.
10
     Before:
11
                        HON. LEWIS J. LIMAN,
12
                                        U.S. District Judge
13

14
                            APPEARANCES
15

16
     MORRISON & FOERSTER, LLP
17        Attorneys for Plaintiff
     BY:  J. ALEXANDER LAWRENCE
18        MICHAEL BURSHTEYN

19
     TARTER, KRINSKY & DROGIN, LLP
20        Attorneys for Defendant
     BY:  MARK BERKOWITZ
21        RICHARD J. LOMUSCIO

22

23

24

25

N2O5eisA

```
1              (Case called)
2              THE DEPUTY CLERK:  Starting with counsel for
3    plaintiff, please state your appearance for the record.
4              MR. LAWRENCE:  Yes, your Honor.  Alex Lawrence,
5    Morrison & Foerster, counsel for Mango Labs, here with Michael
6    Burshteyn, who will be arguing this morning.
7              THE COURT:  Good morning.
8              MR. BURSHTEYN:  Good morning, your Honor.
9              MR. BERKOWITZ:  Good morning, your Honor.  Mark
10   Berkowitz of Tarter Krinsky & Drogin and am joined by my
11   colleague Richard Lomuscio.
12             THE COURT:  Good morning.
13             So, we are here for argument on plaintiff's motion for
14   a preliminary injunction.  I will hear first from plaintiff's
15   counsel, then I will hear from defendant's counsel.  Before I
16   hear argument, I take it that plaintiff is content for me to
17   rule on the motion on the record as it exists now and doesn't
18   intend to supplement the record with anything; is that correct?
19             MR. BURSHTEYN:  That's correct, your Honor.
20             THE COURT:  And same question to defendant.
21             MR. BERKOWITZ:  That's correct, your Honor.
22             THE COURT:  And then the other question I have got for
23   plaintiff is that at the last conference I directed that the
24   U.S. Attorney's office be given notice of this proceeding.
25   Have they?
```

N2O5eisA

1          MR. BURSHTEYN:  Yes, your Honor.  We did comply with

2     the order and provided notice to the U.S. Attorney's office,

3     had a discussion with them.  They have not intervened, nor

4     expressed a position on this, your Honor.

5          THE COURT:  OK.  All right.  Let me hear from

6     plaintiff's counsel and then I will hear from defense counsel.

7          MR. BURSHTEYN:  Your Honor, while the technology here

8     is new, this is a tale --

9          THE COURT:  You can address me from the podium.

10         MR. BURSHTEYN:  Your Honor, while the technology here

11     is new, this is a tale as old as time.  Defendant saw a target

12     for fraudulent market manipulation to grift from and took

13     advantage of it.  Defendant does not contest that there is a

14     greater than 50 percent likelihood that Mango Labs would

15     prevail on its claims for conversion, fraud, and

16     misrepresentation and unjust enrichment.  The only thing that

17     defendant focuses on in terms of the substance of the claims is

18     the declaratory judgment cause of action.  There, the defendant

19     deals only with the issue of duress but its position fails.

20     There was no real negotiation here.  Defendant misappropriated

21     funds unlawfully, something it doesn't contest --

22         THE COURT:  So, let's talk first about the release and

23     maybe you can answer my question as to how, assuming that your

24     client was assigned rights from the token holders, how the

25     release doesn't bar your clients, doesn't carry over to your

4

N2O5eisA

1    potential claim.  All you assert is duress and it doesn't seem

2    like there is all that much that would satisfy the New York

3    standards for duress.

4           MR. BURSHTEYN:  Your Honor, the duress standard, we

5    believe, is satisfied here, because there was an unlawful

6    threat from the defendant.

7           THE COURT:  Well, the unlawful threat was just that

8    they were not going to return money that they said belonged to

9    them -- or tokens that they say belonged to them, correct?

10          MR. BURSHTEYN:  The tokens belonged to the depositors

11   and they were stolen through --

12          THE COURT:  That's your claim, but as I understand it,

13   it is disputed.  Am I wrong?

14          MR. BURSHTEYN:  Your Honor, defendant doesn't actually

15   dispute the unlawful conversion claim or the fraud claim.

16          THE COURT:  I know they're not making that argument to

17   me now but they do say that they are vigorously defending the

18   criminal case where those are the allegations.

19          MR. BURSHTEYN:  Yes, your Honor, and we are happy to

20   go through the elements of those claims.

21          THE COURT:  No, no.  I don't need you to go through

22   the elements, what I need you to do is explain to me first how

23   the elements of duress, under New York law, are satisfied,

24   number one; number two, assuming that they were, how you can

25   maintain a claim in the absence of a tender back to the

1    defendant of the consideration that the defendant paid in

2    exchange for the release?

3            MR. BURSHTEYN:  So, your Honor, I will answer the

4    first question first and then move to the second point.

5            So, in terms of the elements of duress, the unlawful

6    threat here was the conversion.  And further, your Honor, there

7    was no actual consideration provided.  So plaintiffs, the

8    depositors, they could not have exercised any alternative

9    choice.  In terms of the case law --

10           THE COURT:  Couldn't they have sued?

11           MR. BURSHTEYN:  Your Honor, he wiped out all of the

12   assets from Mango Markets and so the even --

13           THE COURT:  Couldn't the token holders have sued

14   individually?

15           MR. BURSHTEYN:  They could not, because their assets

16   were wiped out and they were under a situation where he had

17   misappropriated the funds.  It is essentially as if they left a

18   window open, he came in, and robbed the whole house and said

19   I'll give you some amount of it back if you don't sue me.

20   That's not a real choice.

21           THE COURT:  So, let's talk about fraud cases because

22   that's the underlying allegations are.  Every day in this court

23   house, in this city, in this country, there are people who say

24   my assets were stolen from me as a result of a market

25   manipulation and those matters are settled frequently.  How is

1    your case any different?  In all those cases the plaintiffs say

2    I was robbed, my assets were stolen.  As you point out, there

3    is nothing different about the fact that there is tokens here,

4    it could be securities, and if it were securities the

5    plaintiffs in all of those cases say I was robbed of my money

6    or my stock.  Why is your case different?

7            MR. BURSHTEYN:  Well, your Honor, the standard is an

8    objective standard and so the difference here is looking at the

9    objective circumstances.  In a case such as you suggest, where

10   there might be some sort of a market manipulation claim, it

11   would not be reasonable to have $67 million returned and

12   $47 million retained from that type of a manipulation.  What

13   happened here was defendant just setting his own terms saying I

14   can run off with the money, I have taken it, I have fled the

15   country, and I will give you back whatever it is I feel like.

16   And there was no negotiation, there was no financial pressure.

17   Even in the cases that defendant cites, these are situations of

18   employees who have severance, potentially, provided to them.

19   They don't actually have any case law where a similar market

20   manipulation under fraud was settled in a reasonable way.

21           The other thing, your Honor, is the fraud was not just

22   in the original attack but there was fraud in the inducement of

23   the settlement.

24           THE COURT:  You don't allege that in your complaint.

25           MR. BURSHTEYN:  Your Honor, we do allege that

N2O5eisA

defendant omitted the key facts of what his attack was when he

executed trades with counterparties, and that would flow

through to the settlement.  The other issues -- so, we would

say that the actual language of the settlement is not clear and

unambiguous to satisfy the requirement under New York law for

settlements to be enforced.  I think that there is a further

point where the explicit language, to the extent defendant

relies on it at all, says that it's only potential claims

against accounts with bad debt that are waived.

THE COURT:  Hold on for a second.  You want me to

focus on the language of the release.  Is that what you are

asking me to do now?

MR. BURSHTEYN:  Yes, your Honor, and I am happy to --

THE COURT:  No, I'm happy to go where you want me to

go but I just want you to slow down so I can pick up on the

argument you are making now.  So, what should I look at and

tell me what I should focus on.

MR. BURSHTEYN:  Yes, your Honor.

So, in the language of the release --

THE COURT:  Help me.  Where does that appear in the

papers?

MR. BURSHTEYN:  It is in the complaint, your Honor, in

paragraph 44.

THE COURT:  OK.  I have got it.

MR. BURSHTEYN:  So, if we look at this language, as a

gateway issue, it has to be clear and unambiguous to even be a

settlement.  We don't think it is.  But one thing in here that

is --

            THE COURT:  What is unclear and ambiguous?

            MR. BURSHTEYN:  It doesn't explain who the parties

are.  It doesn't reference the defendant.  It doesn't explain

what claims are settled, the choice of law, or any standard

terms you would expect in a settlement.  This was simply

language the defendant proposed that the depositors, fearful

that he would simply become skittish and make off with the

funds, had no choice to accept.  But one thing that we can see

in this language, which defendant cannot argue against, is it

only waives potential claims against accounts with bad debt.

It does not waive fraud claims, it does not waive any claims

related to misrepresentations against depositors.  And so --

            THE COURT:  Well, isn't the word "any" and "any

potential" read pretty broadly?  There is not a requirement in

New York like there is in California that you need to have bold

letters.  Any potential claims seems to reach pretty broadly.

Why wouldn't that encompass fraud claims?

            MR. BURSHTEYN:  Well, your Honor, it is only against

accounts with bad debt.  The fraud claim is against the

defendant and it is not against his account, it is against him

and his actions, in fact, actions that he took off of Mango

Markets.  He used a Ukrainian's woman's passport to open an

1    account on a third-party exchange to pump the price of Mango,

2    and I think this is part of what differentiates --

3            THE COURT:  So then tell me where your client's rights

4    come in.  What is it that your client was assigned, if it

5    wasn't the claims that purportedly were waived by this release

6    and where your client is out of pocket?

7            MR. BURSHTEYN:  So, your Honor, what happened here is

8    that the claims were assigned to Mango Labs -- and this is on

9    the next page in paragraph 49 of the complaint -- all claims

10   arising out of or related to the loss of money tokens in the

11   incident.  And so, this is one of those claims.  And I think it

12   is a good question about who is out here.

13           So, what happened is there is real loss.  The

14   defendant first exfiltrates all of the funds, and then

15   Mango Labs, LLC came in as, essentially, a claims recovery

16   vehicle.  It was assigned to the claims of the depositors so

17   that it could aggregate them.  And then the DAO treasury sent

18   payment back to all of those depositors.  And so, that money is

19   gone and Mango Labs is, in this assignment, represents that it

20   will transfer any recovery back to the DAO.  And so, to allow

21   defendant to simply unlawfully take funds -- and again, it may

22   be disputed but the standard here is just a 50 percent-plus

23   likelihood of success which we believe is not disputed.  To

24   allow that would enable any type of criminal to come in, steal

25   assets --

N2O5eisA

1      THE COURT:  You say he is a criminal but actually he

2  is not.  He is somebody who has been charged in an indictment.

3  We don't usually call people who have been charged in an

4  indictment as criminals, we actually usually call them as

5  people presumed innocent.

6      MR. BURSHTEYN:  Yes, your Honor.  That is absolutely

7  true.  The standard here, however, is simply that we have a

8  likelihood of success on the claims, which the Court has

9  already ruled, we believe, that was sound, and in defendant's

10  opposition he doesn't dispute the fraud likelihood, he only

11  disputes the declaratory judgment, which we think is fatal to

12  his defense.

13      THE COURT:  So how can the money be kept?  Address the

14  tender point.  From my perspective it looks like you are in a

15  heads-I-win-tails-I-lose-type argument.  You want to keep the

16  money or the people who assigned you the claims want to keep

17  the money but they also want to pursue the claim having

18  released their claims.  I mean, under your view of this release

19  what did the defendant get for the money that he returned, in

20  your view, gave in their view?

21      MR. BURSHTEYN:  Your Honor, in our view neither side

22  received anything that they were not entitled to.

23      THE COURT:  I know that, but put that aside because

24  entitlement is actually the ultimate issue that I'm going to

25  have to resolve.  It has not been proved.  So, what is it that,

N2O5eisA

1    you know, in a release there is always consideration that is

2    provided; one side says I'm entitled to money, the other side

3    says I'm entitled to money.  So, they gave up possession of

4    something, what did they get for that?  And they gave up their

5    claim of entitlement to that amount of tokens; what did they

6    get for that, in your view?

7            MR. BURSHTEYN:  Well, your Honor, defendant simply

8    returned money that he took that was not his to take and so

9    there is no consideration on either side.

10           THE COURT:  All right.  I have got that argument.  I

11   understand what you are saying.  I'm not sure I am convinced by

12   it, you can try to convince me, but why I should view this case

13   to be any different than any other disputed case where there is

14   a settlement breach between parties, each of whom claim an

15   entitlement.

16           MR. BURSHTEYN:  I think the difference here are the

17   objective facts we have presented in the record about the

18   attack itself, starting with the fraud on the third-party

19   exchange, the creation of two accounts without disclosure

20   pumping up the price of Mango thousands of percent, and then

21   wiping out all of the collateral.  I think that is key.  In a

22   theoretical sense your Honor is correct that there could be

23   situations where a settlement is reached over disputed claims

24   in a fraud case but the evidence here satisfies the elements

25   beyond that likelihood of success standard which sets it apart

1    objectively, and if defendant claims that he was entitled to it

2    that has to be weighed against the facts that are in the record

3    and he had no entitlement to it.  There is nothing to support

4    that his trade was legitimate.

5        THE COURT:  Under your view, could a defendant against

6    whom there was really powerful evidence of market manipulation,

7    ever settle that claim?

8        MR. BURSHTEYN:  Your Honor, it is possible, and here

9    we are only seeking a preliminary injunction.

10       THE COURT:  No, but answer my question.  Under what

11   circumstances could a defendant, against whom there is really

12   powerful evidence of market manipulation, settle a claim?

13       MR. BURSHTEYN:  I think we would have to look into

14   whether there was fraud in the manipulation, whether it was

15   really a trade arbitrage, or whether there was some

16   misrepresentations and omissions that weighed against the

17   defense.

18       THE COURT:  Let's say there is a penny stock fraud, a

19   pump and dump scheme, and the evidence is really powerful.  The

20   defendant is operating a boiler room and he is issuing

21   misleading statements and then selling out stock while the

22   price is inflated from nominee accounts that can't be traced

23   back to him and the plaintiffs are out of pocket a lot of money

24   because they're selling to the defendant at this inflated

25   price, and let's add further to the hypothetical that not only

N2O5eisA

```
1    are the individuals who have lost money going up against the
2    defendant but so is the U.S. government, the U.S. government
3    has returned an indictment against the defendant.  The
4    defendant says, You know what?  I don't want to have to deal
5    with the plaintiffs, I would like to settle that case, I'm
6    willing to give you 95 cents on every dollar that you lost.
7    Enforceable settlement in those circumstances?
8             MR. BURSHTEYN:  Your Honor, there are differences in
9    that hypothetical, if I could highlight a few?
10            THE COURT:  OK, but in that circumstance, I take it
11   you say there would be an enforceable settlement?
12            MR. BURSHTEYN:  It would be, and I think there are
13   kind of two key differences; one is in what you described there
14   wasn't any explicit fraud or misrepresentation of identities,
15   maybe using accounts that are unnamed is different from saying
16   you're a Ukrainian woman --
17            THE COURT:  In my hypothetical there was falsity.  The
18   nominee accounts are not just blank, they're nominee accounts
19   that are accounts that bear a name other than the name of the
20   person who is selling the stock; maybe Russian, not Ukrainian,
21   but it is a fake name.
22            MR. BURSHTEYN:  Yes, which you can use a Doe name to
23   create an entity, but hiding the identity unlawfully and lying
24   about it is different.  The other thing is I think a very
25   important distinction is this idea of 95 cents on the dollar.
```

N2O5eisA

1    It is conceivable that in the example your Honor provides that

2    that would be -- objectively you could look at that and say 95

3    percent of the assets are recovered, they clearly could have

4    considered this and rejected it and pursued an alternative.

5    Here, where we are faced with $47 million out of $114 million

6    retained, there is no -- and defendant talks about it as a bug

7    bounty.  There is no such -- it is beyond the bounds of

8    reasonability that anyone would retain $47 million from any

9    type of exposure.  And so, I think that's a key difference.

10   Also, the actions of the defense, something we discussed last

11   time which defendant does not dispute, he fled the country

12   immediately, he started dissipating those assets through

13   offshore exchanges, and this goes to the current standard on

14   the preliminary injunction question.

15           THE COURT:  I'm going to get to irreparable harm in a

16   moment but since you mentioned those facts, and let's assume

17   that I could consider fraud in the inducement even though it's

18   not pled, what are the misrepresentations that you say were

19   made to the token holders that induced them to agree to the

20   settlement?

21           MR. BURSHTEYN:  Well, your Honor, defendant

22   represented at the time and continued in his papers to --

23           THE COURT:  Not like stuff that is subsequent, what is

24   it that defrauded these people?  What were the affirmative

25   misrepresentations at the time of the proposal on October 14,

N2O5eisA

1    2022?

2              MR. BURSHTEYN:  So, his scheme to attack was not

3    complete.  He planned a further attack and he intended to then

4    turn around and, again --

5              THE COURT:  How is that at all either material, and

6    don't you need to say that -- show evidence that at the time of

7    the demand that was his intent?  I mean, that sounds pretty

8    weak to me.

9              MR. BURSHTEYN:  Well, your Honor, we did provide

10   evidence with the reply brief where defendant explains his

11   further scheme in detail, that he had planned, after the

12   settlement was in place, to then come back and essentially put

13   out a proposal to the DAO that would allow him to deplete all

14   of the assets of the treasury and then change the language of

15   the proposal after the fact without detection by using

16   alternative identities.  And so, here again, this isn't a penny

17   stock market where, you know, a whale can come in and affect

18   the price through nominee accounts but rather someone who is

19   attempting to defraud.

20             THE COURT:  Do you want to address irreparable harm?

21   Maybe you can start first with whether -- I take it you have

22   seen the indictment in this case, correct?

23             MR. BURSHTEYN:  Yes, your Honor.

24             THE COURT:  Now, you made an assertion that if there

25   was forfeiture that would only extend to assets in the United

N2O5eisA

1    States.  What's the basis for that assertion?

2            MR. BURSHTEYN:  Your Honor, the indictment would

3    enable substitution of assets in the United States but the

4    government would have to actually go to an offshore entity and

5    attempt to gain their cooperation.  They would not have the

6    ability to take an asset forfeiture order and actually enforce

7    it.

8            THE COURT:  No.  If there was an order of forfeiture

9    against the defendant that would be in personam, wouldn't that?

10           MR. BURSHTEYN:  Your Honor, if such an order existed

11   it would be -- it would be easy for defendant to,

12   essentially -- for his team, for instance, to circumvent it,

13   for him to --

14           THE COURT:  But it would be it in personam, right?

15           MR. BURSHTEYN:  It is conceivable; yes, your Honor.

16           THE COURT:  And if you got a judgment ultimately at

17   the end of the day in this case it would also be in personam?

18   You would have to have a judgment and then you would have to go

19   around to try to enforce your judgment, correct?

20           MR. BURSHTEYN:  Yes, your Honor.

21           THE COURT:  So, and further, with respect to the

22   forfeiture account, it seemed to me but do you disagree, that

23   what the government is seeking to forfeit in that case would be

24   exactly the same assets, at least maybe even broader than the

25   assets that you seek to have me enjoin here?

N2O5eisA

1        MR. BURSHTEYN:  Your Honor, if such an order were to

2    occur, it may.  It's hard to know exactly what it would

3    encompass but the concern is --

4        THE COURT:  And under the law, the title to those

5    assets vests in the United States at least with the return of

6    the indictment, doesn't it?

7        MR. BURSHTEYN:  It is challenging due to the

8    technology at issue because --

9        THE COURT:  I am not asking about the technology, I am

10   asking about the law, whether under the law the title to the

11   assets vests in the United States.

12       MR. BURSHTEYN:  Yes, that would be the position to try

13   to enforce against them.

14       THE COURT:  At the end of the day, assuming that there

15   is a criminal conviction in this case, I take it the government

16   is going to get it ahead of you Mango Labs.

17       MR. BURSHTEYN:  Your Honor, that's not clear.  The

18   government has not intervened or expressed a position --

19       THE COURT:  I know, but just under the law.  Wouldn't

20   by operation of law, the government have a superior right to

21   the right of Mango Labs?

22       MR. BURSHTEYN:  Well, the government would be

23   recovering the assets for victims so it is sort of -- it goes

24   to the irreparable harm question, it is this process of

25   restitution which would occur.  That is something, too, that

N2O5eisA

```
 1    would cause delay and irreparably harming the left.  That is
 2    part of why we are seeking this, essentially, interim
 3    preliminary injunction.  It is possible we could move for
 4    summary judgment quickly in this case and may have a judgment
 5    prior to the completion of a criminal matter.
 6              THE COURT:  Would you have the right, in that
 7    instance, to the recovery of the assets?  Help me with when the
 8    government is also seeking to forfeit the same assets.  I mean,
 9    it really goes to the question of whether your right is
10    superior to the right of the government.  I assume the
11    government will be trying to recover the assets not just for
12    Mango Labs but also for the token holders who -- maybe they
13    were under duress from you.
14              MR. BURSHTEYN:  I can address both of those questions.
15              So, your Honor, it is conceivable that we could
16    recover prior to the government.  The government would have to
17    take a position on that to the contrary, would have to
18    basically come in and enforce their forfeiture order prior to
19    any civil judgment or preliminary injunction freeze order.  In
20    terms of the question of were depositors under duress I can
21    address that as well, but I want to make sure you have any
22    further questions.
23              THE COURT:  Whether they were under duress from you,
24    yes.
25              MR. BURSHTEYN:  So, your Honor, here there was no
```

N2O5eisA

1    duress because there was real consideration.  Essentially, what

2    happened here is depositors received an advance on their

3    claims.  Mango Labs valued their claims as viable and the DAO

4    paid the depositors so that they could recover now and then

5    Mango Labs was assigned those claims.

6         THE COURT:  How much are they recovering on the dollar

7    from you guys?

8         MR. BURSHTEYN:  Mango Labs will put every dollar

9    recovered back into the DAO treasury.  So, Mango Labs does not

10   have a success fee, does not have anything like that.  It is

11   simply, after its costs, going to return those funds.  And

12   there was actually a DAO vote to fund Mango Labs for these

13   purposes.  And you can also look at the language itself of the

14   claims transfer and it provides a really helpful contrast, your

15   Honor, to the settlement from the defendant.  In the claims

16   transfer it explains, in detail, what the claims are related

17   to, to the incident in October 2022, whereas this, as opposed

18   to this term "accounts with bad debt" which is not meaningful,

19   it explains that -- that this is voluntary, expressly informed.

20   They had to actually click multiple buttons so it comports with

21   the law required click rap agreements.

22        THE COURT:  And if you don't recover in this lawsuit

23   then they've lost all their claims against you, correct?  Even

24   if you don't recover they no longer have a claim against you?

25        MR. BURSHTEYN:  Yes, which is not a -- which is

N2O5eisA

1    reasonable because they've been paid fully so they're back to

2    the status quo they were before the attack.

3            THE COURT:  So they got a hundred cents on the dollar

4    for their tokens?

5            MR. BURSHTEYN:  Yes.  But the DAO is out, right?  So

6    it is not as if the money has not disappeared.  There is a

7    really significant gap.

8            THE COURT:  The DAO is out but the token holders are

9    not.

10           MR. BURSHTEYN:  Exactly.  The depositors -- well, the

11   DAO taken holders who have interest in the DAO treasury are

12   out.  The depositors on Mango Markets have --

13           THE COURT:  The DAO token holders are out.

14           MR. BURSHTEYN:  Yes, your Honor.

15           THE COURT:  And how much are they out?

16           MR. BURSHTEYN:  Through the amount that defendant did

17   not return, $47 million.  So, he took 114, gives back 47 --

18           THE COURT:  So those DAO token holders are different

19   from your client, right?  They're not legally identical.

20           MR. BURSHTEYN:  Right, although our client is assigned

21   the claims, but yes.

22           THE COURT:  Right.  So, if you don't get anything from

23   the defendants in this case then the DAO token holders will be

24   out a whole bunch of money and they also will not be able to

25   sue you?

N2O5eisA

1          MR. BURSHTEYN:  Yes, your Honor, although we are

2     essentially a vehicle funded by the token holders to pursue

3     their claims.  We are not --

4          THE COURT:  Right, but they're not -- I guess we are

5     just talking past each other.

6          They gave up a legal right, the right to pursue you.

7     It was not particularly gratuitous, you got something out of

8     this, you got a release from their claims against you.  You

9     demanded that, right?  This was not just gratuitous.

10          MR. BURSHTEYN:  Yes, your Honor, although they could

11     have negotiated differently, it certainly would have --

12          THE COURT:  Did you give them an option?

13          MR. BURSHTEYN:  There was no concern or request from

14     that.  Everyone -- the way Mango works is it is a decentralized

15     governance forum so all of this is out in the open.  People are

16     coming in, they're trying to figure out what to do, they're

17     putting on proposals, they're voting on it.  We are essentially

18     a vehicle funded by those token holders to do what we are

19     doing.  We are not -- they didn't have claims against Mango

20     Labs that were meaningful.

21          THE COURT:  Then why did you ask them to release them?

22          MR. BURSHTEYN:  As a matter of course, and let's say

23     that, you know, we are taking on significant risk by pursuing

24     this action and investing resources in it, it would be

25     reasonable to have this essentially like an indemnification for

N2O5eisA

1    that.

2         THE COURT:  Why isn't your client fully protected by

3    the criminal action?  You know, the criminal action, if the

4    defendant in this case secrets assets, does all the kinds of

5    stuff that you are worried about, my judgment is not going

6    to -- my order of preliminary injunctive relief is not going to

7    have much force, it is not going to have as much force as the

8    force of the entire United States Department of Justice.

9         MR. BURSHTEYN:  Your Honor, that is a fair point.  I

10    think the issue here is one of timing.  Simply, where we sit

11    today there is nothing stopping defendant, outside of your

12    Honor's temporary restraining order, from secreting these

13    assets, and so a preliminary injunction wouldn't have the same

14    effect.

15         THE COURT:  It would be pretty stupid for the

16    defendant here, facing an indictment, to do the kinds of stuff

17    that you are talking about, wouldn't it?

18         MR. BURSHTEYN:  Your Honor, I would agree as a general

19    principle, however here defendant has demonstrated, through

20    evidence in the record, that he is willing to flagrantly

21    violate the law.  After he did the attack he went on podcasts,

22    he said there will always be --

23         THE COURT:  What did he do after the time of the

24    criminal charges that you say should be -- gives rise to your

25    concern that there are not going to be assets left at the end

N2O5eisA

1    of the day, either to satisfy you or to satisfy the government?

2              MR. BURSHTEYN:  So, to directly answer the question

3    about after the criminal charges, there was an automated

4    transaction -- according to the defendant automated -- on his

5    accounts, and it illustrates that the assets that he converted

6    are at high risk.

7              THE COURT:  What was the automated transaction?  Walk

8    me through that slowly.

9              MR. BURSHTEYN:  So, your Honor, there was a

10   transaction, we had submitted a declaration prior to the TRO

11   hearing and we can look at that together, if you would like.

12             THE COURT:  OK.  Is that Docket no. 9?

13             MR. BURSHTEYN:  Yes, it is the Rodrigo declaration.

14             MR. LAWRENCE:  It is Docket no. 8, your Honor.

15             THE COURT:  OK.  Give me one moment.

16             MR. BURSHTEYN:  It is supplemental -- your Honor, it

17   is actually Docket 25 in paragraph 1.

18             THE COURT:  Docket no. 25.  OK.  Give me a moment.

19             MR. BURSHTEYN:  Certainly.

20             (Pause)

21             THE COURT:  Do you have an extra copy of it, by

22   chance?

23             MR. BURSHTEYN:  Yes.

24             THE COURT:  All right.  Give me a second.

25             MR. BURSHTEYN:  Sure.

N2O5eisA

THE COURT:  So walk me through what happened here and what the defendant attempted to hide through this.

MR. BURSHTEYN:  Yes, your Honor.

So the significance of this is it was a transaction related to the AAVE protocol that he attacked after his attack on Mango Markets and it demonstrates that the pieces he put into place and what he has done with the digital assets in terms of putting them on the high risk maneuvers and trades has created a situation where they're at imminent risk of depletion.  This actually occurred in the time after the complaint was filed, and absent on order --

THE COURT:  What exactly happened?  This was a transfer of digital assets that you say were the proceeds of the manipulation that you challenge in this case?

MR. BURSHTEYN:  It is our investigation -- it is difficult to know, and only defendant knows exactly if these were our assets that he used here but the accounts he has mixed and what happened here is AAVE is doing a swap with him, essentially to try to correct for the attack that he did on them.  Right?  There are these other platforms, and this is an example of one, that also he has attacked and that has claims against him.  In the particular case of AAVE, there is a way for them to initiate this transfer through his account.  And there are other examples, your Honor.  I think that it is important to look at what the defendant did after the attack,

```
 1    not just after he was charged, and the reason why is because
 2    everything he did in that lead-up set up the imminent risk of
 3    dissipation.  I think that is also relevant to some of your
 4    prior questions in that we are not seeking a return of the
 5    funds now or a judgment, we are simply seeking to freeze the
 6    status quo.  And, defendant has not presented any reason why he
 7    would need these assets, we don't believe they were his and we
 8    have kind of gone through that but it is at imminent risk of
 9    dissipation and there is a team out there.  There are some John
10    Does that worked with the defendant based on his own statements
11    that your order -- the TRO order -- extends to today, and a PI
12    would as well.
13            THE COURT:  All right.  Let me hear from your
14    adversary.  I will hand this document back now, I have the
15    document you were referencing.
16            MR. BERKOWITZ:  Thank you, your Honor.
17            So, I did want to start out by saying there were
18    various times where counsel said that defendant doesn't contest
19    certain things.  The defendant vigorously contests the
20    allegations in this case, the allegations that are made in the
21    criminal proceeding, and he is presumed innocent until proven
22    otherwise.  There is a lot of bluster in the briefs and it
23    relates to these other actions, but the action in this
24    particular case and between these particular parties is a bit
25    different.  It does sort of resolve around the settlement of a
```

N2O5eisA

1    release agreement that was entered.  In our view this is more

2    of a contract matter and that settlement release agreement does

3    preclude the other claims that are brought here which is why

4    our brief, in our opposition, focused on the duress argument

5    that plaintiffs have raised here.

6        THE COURT:  Do you want to address their argument that

7    the release is ambiguous and doesn't actually release your

8    client, just waives potential claims against accounts with bad

9    debt, whatever that particularly means?

10       MR. BERKOWITZ:  Sure.  I think that bad accounts with

11   bad debt refers to our client, they are referring to the

12   accounts that he was holding.  Everybody seems to understand at

13   the time what was encompassed in that release and everybody

14   knew what to do once it was completed.

15       THE COURT:  Why do you say that accounts with bad debt

16   refers to your client?

17       MR. BERKOWITZ:  My understanding is that the accounts

18   that he had opened, at least one of them now had bad debt, so I

19   think that it was understood by the parties that his accounts

20   and his -- any involvement here would be released as well.  And

21   following the conclusion of that vote, the defendant did do his

22   part, he returned a certain number of assets that were

23   specified in the vote.  The DAO treasury, at that point, was

24   supposed to return funds, any other funds to the users to make

25   them whole, and that did happen.  The only additional event

N2O5eisA

1    that took place was that Mango Labs, who is sort of this

2    third-party consultant, sort of inserted them in that process,

3    even though that wasn't part of the deal, in order to, I guess,

4    bring this case and to clear Mr. Durairaj and the other

5    officers of Mango Labs of potential liability.  That part was

6    not negotiated.  What was He supposed to happen was our client,

7    Mr. Eisenberg was supposed to return funds, and the treasury

8    was supposed to return any other funds to the users to make

9    them whole and that was really the sort of substance of the

10   arrangement.

11            So, you know, we focused on that element, on the

12   starting point being the agreement and for plaintiffs to bring

13   any other claims, the first step is for them to show that that

14   agreement is not enforceable and I think that that's where they

15   really fail because the duress argument really has to be

16   brought on an individual-by-individual basis to show that

17   somebody was actually under duress.  There is no evidence of

18   that.  There is no evidence that anyone was actually under

19   duress.  We don't know what portions of their account is

20   comprised, what their personal situations were.  There is

21   really no evidence of duress, this idea that you make these

22   broad arguments that a group, as a whole, was sort of under

23   duress and had to do something, it is not supported by the case

24   law.  It is really -- it is a high standard to meet and there

25   is just no evidence to support it and, again, it is an argument

N2O5eisA

1    that if they want to make that argument it is an argument that

2    should have been made before Mr. Eisenberg returned the funds.

3    It should have been made back in October.

4            So, they waited until after he returned the funds,

5    they waited until after everyone was made whole, and waited

6    until after all the claims and charges were brought.  So, we

7    think it is really too late to go into there.

8            I do have to, I guess --

9            THE COURT:  How do you respond, though, to the fraud

10   in the inducement argument, that there were facts that were

11   withheld by your client.  The subsequent intent to engage in

12   the subsequent attack was the main one that I heard.

13           MR. BERKOWITZ:  I don't think that -- there is no

14   argument that particular representations were made to any

15   particular users.  I mean, that is sort of the threshold

16   question for fraudulent inducement claim or misrepresentation

17   claim.  There is no misrepresentation to any particular user,

18   token holder, or anything like that.  It is just not here in

19   the record and I do think that any fraud claim would be

20   released as part of the agreement, that's why we focused on

21   that, but if you go through the elements, that would be

22   required to prove fraud.  I think the representation claim is

23   just not there, it is not pled in their complaint, it wasn't in

24   their motion.  They are pointing to representations that were

25   made potentially to third-party exchanges and that's not a

N2O5eisA

1   representation to the actual claimant and I don't think that,

2   legally, would be relevant here.  We are looking for some sort

3   of representation to the actual token holders, the users, and

4   we just don't see that in the pleadings.  We don't really

5   believe that the fraud claim would even survive a motion to

6   dismiss or anything of that sort.

7          THE COURT:  You make an argument about standing.  Can

8   you explain that to me?  Because if I look at paragraph 49, it

9   does look like there were rights that were assigned to the

10  Mango Labs so why isn't that fully dispositive of your claim

11  with respect to standing?

12         MR. BERKOWITZ:  Sure.

13         So, when we first dived into this there was really

14  some confusion as to who Mango Labs was and how they wound up

15  in this position and all we saw, really, was this one I

16  guess -- the release that they supposedly clicked through, but

17  there is really no indication that anybody had actually gone

18  through with it, had actually executed this release process.

19  Attached to their motion papers there was one, seemed to be a

20  representative release.

21         THE COURT:  Now you are referring to the release at

22  paragraph 49 of their complaint?

23         MR. BERKOWITZ:  I am.  And also we can look at the

24  whole release, actually, in context.  It was attached to their

25  initial moving papers, it is document the 9-3 on the docket.

N2O5eisA

1          THE COURT:  Give me a moment.  Why don't you tell me

2    what it says.

3          MR. BERKOWITZ:  Sure.  This is the same language that

4    you see in the complaint, you see it here in context as opposed

5    to what it looked like on the screen when a user would go

6    through this process, and our understanding is this was some

7    sort of representative release or transfer.  It wasn't clear to

8    us whether there had actually been a transfer consummated when

9    they took place, who executed them, and that's why we were

10   questioning the standing issue, is did they really receive any

11   rights at all?  And we just weren't seeing any solid evidence

12   that that had happened.

13         In the reply they attached some additional documents

14   showing a list of what appears to be recent transfers within

15   the past few weeks.  That just sort of made things, I think, a

16   little more confusing as to what rights they had when they

17   filed this case, what rights they had at the time that they

18   moved for the TRO and the PI.

19         THE COURT:  But you are not disputing that currently

20   they've got standing.

21         MR. BERKOWITZ:  It is unclear to us what rights were

22   received and who those were from.  It looks like there is some

23   accounts have clicked through this, potentially.  What value

24   that could be ascribed to that is not entirely clear.  And,

25   their papers seems to go back and forth describing that, at

N2O5eisA

```
 1    some point the declarations say that the depositors have agreed
 2    to assign over 90 percent of their claims, in the reply they
 3    say now that the depositors have assigned 90 percent of the
 4    value of their claims.  So, we were struggling with where this
 5    90 percent comes from and what has really been actually
 6    assigned to them, what rights they have, and do they really
 7    have standing to bring this case and do they have any harm,
 8    does Mango Labs have harm.  The individual token holders have
 9    been made whole at this point.  I think that everybody seems to
10    agree to that.  And what we heard before was that if there is
11    recovery it could be returned to the treasury but it is not
12    clear -- to us it is still not clear that Mango Labs, who is a
13    third-party in all these events, actually has any real claim
14    here or any harm.
15            THE COURT:  Well, but if they're assigned the rights
16    that's enough to establish Article III standing, correct?
17            MR. BERKOWITZ:  Users have already been made whole so
18    they don't have anything left to assign, their rights have been
19    extinguished at that point.
20            THE COURT:  Well, that's dependent upon your argument
21    about the release, correct?  If the release, it turns out, is
22    invalid, then the rights of Mango Labs have value and they have
23    a right to sue on them, correct?
24            MR. BERKOWITZ:  They could.  If they can undo the
25    release agreement they could have standing, but I would say at
```

N2O5eisA

1    this point the value of those claims has not been established.

2    I mean, this one example that is attached to her motion --

3            THE COURT:  That is also dependent on your argument

4    about the validity of the release.  I am really trying to

5    understand whether you have got an independent argument at this

6    point about standing or whether your argument really is just

7    about the validity of the release.

8            MR. BERKOWITZ:  We have both.  I think it is the

9    validity of the release itself but it is also the value of the

10   claims.  To even establish diversity jurisdiction, you need to

11   show that you have a certain $75 worth of damage.  What they

12   have attached here is what appears to be about $1,000 worth of

13   reimbursements for unidentified claimants.  There is really

14   nothing else attached to their motion that would show value,

15   that would show any harm, or any actual damages.

16           THE COURT:  You are not talking about diversity

17   jurisdiction, you are not talking about standing, so are you

18   pressing an argument now about standing?

19           MR. BERKOWITZ:  Just based on the release, yeah.

20           THE COURT:  Just based on the release.  Got it.  OK.

21           Let me hear the rest of your argument.

22           MR. BERKOWITZ:  Sure.

23           THE COURT:  But maybe you can address for me on the

24   balance of hardships what the hardship would be to your client

25   of issuing the requested preliminary injunction.  If I credit

1    your papers and the point that I made earlier about the

2    criminal action, these assets are not going to go anywhere, so

3    why shouldn't I put in place a preliminary injunction just to

4    freeze things as they are pending the outcome of the criminal

5    case in this case?

6         MR. BERKOWITZ:  So, I think what was discussed

7    before -- and your Honor is correct, that the asset forfeiture

8    in the criminal matter is broader than what could be entered in

9    this case and the defendant is not going to violate that or

10   think about violating that and there is no -- just to quickly

11   touch on the point, there is no evidence that the defendant has

12   done anything to touch these funds since he has been in

13   custody.  It is just not true.

14        THE COURT:  What do you say about the supplemental

15   declaration that I was given?

16        MR. BERKOWITZ:  Yes, that was just an automated

17   transaction that took place, a computer carried out.  It is

18   similar to a short being covered and the money in the account

19   was liquidated.  Nobody touched that, it was completely

20   automated.

21        THE COURT:  All right, but what is the harm to your

22   client of issuing a preliminary injunction as I think about

23   balance of hardships?

24        MR. BERKOWITZ:  So, I think that that liquidation is

25   one example, there needs to be some management of these funds

N2O5eisA

 1   rather than sort of just freezing them as is.  It is

 2   cryptocurrency, there is risks that it can go up and down.  It

 3   would need to be overseen and somehow managed to the best that

 4   could be done and that ties back to sort of what the scope of

 5   any injunction would be.  It would need to be specific to

 6   identify these particular accounts and any particular wallets

 7   and things like that and that was never done here.  There are

 8   these sort of broad strokes that there is $47 million out

 9   there.  There is nothing in the papers that really goes through

10   and explains what that is actually comprised of and, as we

11   pointed out in our papers, it seems like they're going after

12   Mr. Eisenberg's initial investment, they're going after

13   portions of funds that haven't yet been assigned to them and we

14   don't really understand how that was possible.  In the reply

15   they give that a little bit of short shrift, they say, well,

16   Mr. Eisenberg knows what funds are at issue, he should be able

17   to figure it out.  I don't think that is the law.  I think that

18   any order would have to be very specific as to what is enjoined

19   and how we would carry that out.  Again, we don't see -- and

20   there is really no responses to how his money -- his initial

21   investment would be captured by that $47 million.

22        THE COURT:  In the criminal case the plaintiff makes

23   the argument that in the criminal case there is no outstanding

24   order right now, there are no restraints on your client from

25   dissipating the assets that would go to satisfy an order of

N2O5eisA

1    forfeiture or preliminary order of forfeiture if there was one

2    that was entered in that case, correct?

3        MR. BERKOWITZ:  Right.  My understanding is the client

4    is treating it as it is in place at the moment and obviously

5    has no intention to violate that.  He has appeared in this

6    case, he is defending all of the cases.  There is really

7    nothing to -- the test is really is somebody going to go ahead

8    and try to frustrate a judgment, is somebody going to go ahead

9    and move assets beyond -- put them in a place where they can't

10   be reached in the event of a judgment.  There is no showing

11   here that Mr. Eisenberg is going to do anything like that.  But

12   it is not simply --

13       THE COURT:  As things currently stand there is no

14   legal restraint on his ability to dissipate assets other than

15   what is imposed by law.  There is no Court order.

16       MR. BERKOWITZ:  Just what is in the indictment --

17       THE COURT:  But that doesn't have -- does that have or

18   doesn't it have legal effect in terms of preventing your client

19   from dissipating the assets?

20       MR. BERKOWITZ:  I can tell you that he is treating it

21   as it is -- as an order in place and that it does govern his

22   current situation.  At the moment he is still in custody so it

23   is really sort of a moot point but he is going to treat that

24   asset forfeiture order and substitution order as they are, you

25   know --

N2O5eisA

```
 1              THE COURT:  What is the situation in terms of his
 2     custody at the moment?
 3              MR. BERKOWITZ:  He is currently in custody with the
 4     next hearing scheduled for next month.
 5              THE COURT:  When is the next bail hearing scheduled
 6     for?
 7              MR. BERKOWITZ:  It is mid-March, March 14.
 8              THE COURT:  OK.  I take it he is at the MDC or
 9     somewhere?
10              MR. BERKOWITZ:  He is in Essex.
11              THE COURT:  Essex?
12              MR. BERKOWITZ:  Yes.
13              THE COURT:  Are you criminal counsel?
14              MR. BERKOWITZ:  I am not.
15              One interesting point that came up, it does seem that
16     plaintiffs kind of want it both ways, they want to say that the
17     agreement that was entered with Mr. Eisenberg is not
18     enforceable but at the same time they want to say that the
19     agreement between Mango Labs and the users somehow is
20     enforceable.  They really can't have it both ways.  If
21     anything, their agreement -- the agreement between Mango Labs
22     and the users was forced on them.  The other agreement was
23     negotiated --
24              THE COURT:  Why do you say it was forced on them?
25              MR. BERKOWITZ:  Well, we can see it right here.  If
```

N2O5eisA

they wanted to get their reimbursement, which they were already

guaranteed, they had to go through this click-through and agree

to release Mango Labs from any liability.  I am looking at

document 9-3.  As I said before, that was not part of the

agreement.

So, after this all happened, everybody carried out

what they had to carry out, life went on for the next couple of

months.  It wasn't really until all those other actions came

about that Mango Labs came forward with these claims and one of

the issues is the delay, it gets to the irreparable harm.

There is really to reason for that delay.  As it came out in

the papers there was nothing in the complaint --

THE COURT:  Isn't a sufficient reason for the delay

that your client had not yet been apprehended, that the

criminal charges hadn't been brought, and that they were

cooperating with the U.S. attorneys office?  If all of those

facts are true that would establish a pretty good reason for

them not to have gone ahead and filed this complaint.

MR. BERKOWITZ:  There is no evidence of that in the

record.  There is no declaration supporting that, that they

were actually doing that, it is just attorney argument.  We

don't know what happened.  And there was nothing stopping them

when the events happened from bringing a suit just like this

one from seeking *ex parte* relief.  They could have done all of

that.  They simply didn't.  So, I think that the fact that

N2O5eisA

1    three months have passed by --

2          THE COURT:  They also now have the benefit of the

3    facts that were revealed through the criminal case.  Isn't that

4    a reason that justifies them bringing suit now?

5          MR. BERKOWITZ:  There was nothing stopping them from

6    bringing suit on the same claims.  They're saying that there

7    was an agreement, that they want to overturn the agreement, and

8    that they have some unjust enrichment and conversion claims.  I

9    don't see why they couldn't have brought those then.

10          We have covered the specificity requirement, we don't

11   believe that the current form of the preliminary injunction

12   order that was proposed is adequately specific under the

13   federal rule, it is just not enforceable, and we don't know

14   what accounts would need to be held or frozen, what wallets

15   they're talking about and, really, how they came up with that

16   number.  All their papers refer to an approximately $47 million

17   number.  We are not clear how they got there.  We do ask if

18   there is injunction put in place that there is a bond.  As we

19   said before, we are dealing with assets that can go up and down

20   in value and if they are not properly managed, defendant

21   shouldn't be responsible for that.  If, from a year from now,

22   the account goes to little or nothing, the plaintiff should be

23   responsible for that.

24          THE COURT:  Is there somebody who is managing the

25   crypto assets now while the defendant is detained?

1          MR. BERKOWITZ:  Not yet.  That is being worked on, to

2     get powers of attorney and what not.

3          THE COURT:  OK.  Let me hear back from the plaintiff.

4     One question is if the defendant is detained, what is the risk

5     that your client suffers while he is detained that there is

6     going to be something improper going on?  And then you can

7     address any of the other arguments you have got.

8          MR. BURSHTEYN:  Thank you, your Honor.  I will answer

9     your question and I appreciate the opportunity to address the

10    remainder.

11         So, defendant is a bot trader.  He -- and he

12    explicitly states that in the podcast we submitted -- the way

13    he does these trades is by programming computer software to

14    automatically execute his schemes.  And so there is an

15    incredible risk here which was just brought up about how there

16    are these automated trading bots out there conducting trades

17    that defendant set in motion.  And it is not just him, it is

18    his team which he has admitted to working with a team.  And so

19    the nature of the assets, the nature of what he does, makes it

20    so that wherever he is he doesn't really need to communicate

21    with anyone, he can just set it in motion, but an order from

22    this Court would require defendant to stop that.

23         If I may address some of the other points?

24         THE COURT:  Yes.

25         MR. BURSHTEYN:  I think one point, your Honor, on the

N2O5eisA

1    issue of whether the language of the settlement is clear and

2    unambiguous.  There is actually evidence in the record that

3    it's not, that in the interview that defendant gave in the

4    podcast, it was discussed what does this bad debt language

5    mean.

6         THE COURT:  I'm not sure the podcast actually is in

7    the record.  I mean, you cite to it in a footnote to a brief

8    but you don't actually give me any evidence of it.  Is it in

9    the record?

10        MR. BURSHTEYN:  Your Honor, we would argue that as a

11   publicly available link you do not need to take it for the

12   facts or the truth of the statements in it but the Court can

13   notice the URL footnoted in the brief.  There is no dispute as

14   to it is something that the defendant -- actually, it is his

15   words talking to a reporter, and in that discussion there was

16   confusion about whether the bad debt might refer to Mango's

17   potential, some sort of bad debt with another protocol called

18   Solend.  And that's an example of why this is -- and, I think

19   another thing, your Honor, that the defendant glosses over, is

20   it only says the token holders' release.  The token holders are

21   not the depositors, necessarily.  So, Mango Markets is a market

22   that depositors go in, he wiped them out.  There is nothing in

23   there that says --

24        THE COURT:  Didn't he wipe them out through the

25   depositor?  Does DAO have a separate legal entity than the

N2O5eisA

1   depositors?

2           MR. BURSHTEYN:  The DAO is -- yes, your Honor.  The

3   DAO are people who --

4           THE COURT:  So, there is the DAO and then there are

5   the depositors who help fund the DAO.  Is that the way it

6   works?

7           MR. BURSHTEYN:  Your Honor, the way it works is that

8   the DAO is comprised of Mango token holders.  They use those

9   governance tokens and NGO to vote on how to operate the DAO and

10  its treasury.  Depositors are users of the Mango Markets

11  protocol.  You or I could be depositors and not participate in

12  the DAO treasury.  We are in the market, we are borrowing, we

13  are lending, we are using the protocol, and defendant wiped us

14  out, the depositors.  Nothing in that settlement says the

15  depositors waived claims against them.  In fact, it specifies

16  the token holders do.

17          So, for instance, there is a difference between the

18  DAO token holders who had to fund the depositors to get their

19  money back and the depositors, themselves, who assigned their

20  claims to Labs LLC.  So, I don't know how defendant can argue

21  he has any waiver of any claim from any depositor.  For all of

22  the ambiguity in the agreement, which we think is there, it at

23  least only satisfies the token holders' claim.  That's one

24  issue.

25          Your Honor, another issue about the representations,

N2O5eisA

1    if I may, defendant explained about how his position around --

2    that there wasn't an affirmative misrepresentation about an

3    intent to attack or that the representation was on a

4    third-party exchange.  What that ignores is the omission that

5    these are material facts.

6              THE COURT:  You don't have to show duty before you

7    rely upon an omission theory.  Where is the duty?

8              MR. BURSHTEYN:  Your Honor, in the negotiation to --

9    there was a duty to be honest, to present material facts --

10             THE COURT:  There is a duty to not lie but I don't

11   think there is a duty -- you haven't cited me cases where there

12   is a duty to disclose everything would be material.

13             MR. BURSHTEYN:  There is a limiting principle here so

14   you wouldn't necessarily need to disclose everything, but the

15   intent to do another unlawful attack, or the fact that this

16   very attack was not -- so, defendant, he actually represented,

17   *Everything I did was what I was allowed to do*, right, clothed

18   as law.  I was able to make these trades.  But, he couldn't do

19   it, he had to pretend to be someone else, right?  The actual

20   code that he claims allowed him to do all of these things, it

21   would not have been possible.  Right?  He would not have pulled

22   it off if he couldn't go to the other exchange.

23             THE COURT:  Right.  That's how, according to your

24   allegations and the allegations in the criminal case, the fraud

25   was consummated.  It is not alleged that that's how the release

N2O5eisA

1    was obtained.

2            MR. BURSHTEYN:  But, your Honor, that's -- it is

3    alleged that these were material omissions that constituted

4    fraud and they would infect the release according to the

5    existing language because, of course, you wouldn't -- you just

6    wouldn't agree to that deal, right?  You wouldn't, if you

7    knew --

8            THE COURT:  Why not?  I mean, let's say -- I don't

9    know whether 95 cents on the dollar is fair, 75 cents on the

10   dollar is fair, 50 cents on the dollar is fair, 35 cents on the

11   dollar is fair.  Usually what Courts do is leave it to the

12   people who have the claims and the people who are facing the

13   claims to reach a settlement in this as long as there is no

14   deception in terms of the settlement itself, then those

15   agreements are enforced.  I mean, I don't think in any case

16   that I was previously involved in, in order to settle a case,

17   the bad guy had to make a full confession before the plaintiff

18   accepted the settlement.

19           MR. BURSHTEYN:  Your Honor, the limiting principle

20   here is that this particular fraud would have changed the value

21   of the claims that were being settled.

22           THE COURT:  Isn't that always true in connection with

23   every settlement?  If I were to adopt your principle, wouldn't

24   that mean that for there to be an enforceable settlement the

25   defendant would have to reveal all of the bad stuff which would

1      mean, frankly, that there would never be a settlement because a

2      defendant is never going to reveal all the bad stuff, the

3      defendant is going to make the plaintiff do some work.  That's

4      why courts exist, that's why you do the litigation.

5              MR. BURSHTEYN:  But there would be typically

6      representations and recitals in the settlement, explanations of

7      what the claims are, what the allegations are.  Of course,

8      there can be a denial of the wrongdoing but here is the

9      difference.  In every case they cite an employment context.  It

10     is about an offer of severance, right, that it is not entitled

11     to and so that's not under duress.  The difference is if you

12     denied a bonus payment, if --

13             THE COURT:  What is your best case for the proposition

14     that for there to be an enforceable settlement the defendant

15     has to reveal all of the bad stuff or the settlement has to be

16     worth 95 cents on the dollar?  I mean, don't tell me why their

17     cases are wrong, tell me why what your best case is for why you

18     are right.  You have got the burden.

19             MR. BURSHTEYN:  Yes, your Honor.

20             So, we cite several cases on the question of

21     rescinding settlement for fraud, that's the *Shipping Funds v.*

22     *Icon Cap* case, the *Bastedo v. Rose-Wolcott* case.

23             THE COURT:  Those are cases where there are

24     misrepresentations that are made?

25             MR. BURSHTEYN:  Yes, and which can be omissions of the

N2O5eisA

representation, like, that we are walking away, that we are

cleaning ourselves of this and we are moving on, and I don't

have another scheme.  So yes, your Honor, those are cases on

the question of fraud.  There are also quite a few cases we

cite on the question of duress that we think are strong in the

point of when it's an unlawful threat, right?  Yes, you may

have --

            THE COURT:  What's unlawful about I'm going to give

you some of the money you want back if you release the claims

against me?

            MR. BURSHTEYN:  It's because I took all of your money

and so there is this economic pressure that I have created.

            THE COURT:  We are going around in circles.  Your

proposition is that an alleged thief can never settle a case.

            MR. BURSHTEYN:  Well, your Honor, there is -- so here

is an example from the Costco case.  Costco threatened criminal

prosecution on someone for shoplifting even though the knife

was found in a different person's possession and that was

considered duress where it was not a legitimate claim that they

had -- that Costco had against their former worker.  Here it is

a similar thing, it is a difference between a clean market

manipulation scheme or trading strategy and something that at

least has a greater than 50 percent likelihood of being shown

to be unlawful.

            THE COURT:  Move on to your next argument.

N2O5eisA

1          MR. BURSHTEYN:  Yes, your Honor.

2          So, that's on the omission point.  On the standing

3     issue, in terms of what we have alleged, we have alleged that

4     over 90 percent of the claims' value and 90 percent of the

5     claims, it is equivalent to saying 90 percent of the value of

6     the claims was transferred at the time we filed this case.

7     They keep coming in.  There is additional transfers, even as

8     recently as this week and --

9          THE COURT:  I don't know that you need to spend a lot

10    of time on standing.

11         MR. BURSHTEYN:  Sure.

12         Finally, your Honor, I think going back to the point

13    of what is the limiting principle here.  Right?  The Court

14    should enforce settlements but it should look at, first, the

15    settlement on its face.  Is it clear?  In this case this is far

16    from a settlement you would see from a penny stock manipulation

17    case, it doesn't even include the relevant parties, the

18    depositors.  And then you can look at are the claims unknown at

19    the time of settlement?  So, it is often that settlements are

20    invalidated where there was an unknown claim that defendant

21    knew about that he didn't disclose.

22         THE COURT:  That argument is not particularly

23    persuasive to me.  You can waive unknown claims, there are

24    releases all the time that say all claims known and unknown.

25         MR. BURSHTEYN:  Yes.

N2O5eisA

1          THE COURT:  The case that you cite happened to have

2    involved a release that had language that said I am releasing

3    known claims only.

4          MR. BURSHTEYN:  It is an interesting question about

5    whether you default to known or unknown, your Honor.  The

6    language here doesn't say what claims, known or unknown, and it

7    would be reasonable to conclude, based on just reading the four

8    corners of the contract, that they were just talking about bad

9    debt claims against counts that had bad debts.  Those are not

10   claims for fraud against any individual or unjust enrichment

11   either.

12         THE COURT:  OK.

13         MR. BURSHTEYN:  At best it is a conversion, it goes to

14   the conversion point.

15         THE COURT:  Anything else?

16         MR. BURSHTEYN:  That's all, your Honor.

17         THE COURT:  Am I correct that the TRO expires today?

18   Is that right?

19         MR. BURSHTEYN:  Yes, your Honor.

20         THE COURT:  Does defendant have anything further?  I

21   have one question for defendant.

22         MR. BERKOWITZ:  Sure.

23         THE COURT:  So, the TRO expires today.  Your client is

24   detained and I need time to study the arguments on both sides.

25   I want to know if there is any objection to me continuing the

N2O5eisA

1    TRO for a period of two weeks so that I can consider the

2    arguments on both sides.

3              MR. BERKOWITZ:  That's OK, your Honor.

4              THE COURT:  OK.  All right.  Give me one moment and I

5    will -- I need to confer and then I will be back out with you.

6              (Recess)

7              THE COURT:  So, I am going to continue the TRO for two

8    weeks until March 10th, for good cause, and on consent of the

9    parties.

10             I do have a question that I will ask of plaintiff

11    first and then of defendant, and it is really to walk me

12    through the distinction that the plaintiff was making between

13    the depositors and the token holders.  And when you address

14    that point you might also help me with the fact that the

15    depositors' agreement relates to the loss of tokens and whether

16    that means that the depositors, also, are token holders.

17             So, walk me through that and then I will hear from the

18    other side on that.

19             MR. BURSHTEYN:  Yes, your Honor.

20             I think I can clear it up with answering the second

21    point briefly and then I will go through the distinction.

22             THE COURT:  OK.

23             MR. BURSHTEYN:  The depositors had all sorts of tokens

24    the market.  The way Mango Markets works is you can put,

25    borough, lend all sorts of different tokens, not just MNGO

N2O5eisA

tokens.  So the "token holders" in that language refers to MNGO
token holders, the people that are voting on proposals for the
DAO.

THE COURT:  So, when the depositors agree to transfer
to you any claims arising out of or related to the loss of
tokens in the October 2022 incident, they're referring to MNGO
tokens; is that right?

MR. BURSHTEYN:  No, they're referring to all sorts.

So, you can see here actually in the proposal, in
paragraph 43, it lists off he took Solana token, BitCoin,
Serum, Ethereum, there was Mango tokens as well, USDC.  So, he
cleaned out everything that was on the market as collateral.

THE COURT:  So there are people who held tokens in
MNGO and all kinds of other tokens; is that right?

MR. BURSHTEYN:  Yes.  They had accounts on Mango
Markets; they could have had a mix, they had a basket of tokens
there, and that's what they transferred over.

THE COURT:  So they're account holders in Mango
Markets?

MR. BURSHTEYN:  Exactly, your Honor.

THE COURT:  And as a result of the October 2022
incident, they lost all of their tokens whether they were MNGO
and others?

MR. BURSHTEYN:  That's right, your Honor.  And they
didn't release defendant.

N2O5eisA

| 1 | THE COURT: In what respect are they also depositors? |

You say that they're also depositors.

MR. BURSHTEYN: We used the word "depositors" because the way that they put those tokens on to the market is by depositing them into their accounts. So, you can call them account holders.

THE COURT: OK, also account holders.

And then, when you referred to paragraph 44, you say that paragraph 44 is different from paragraph 49.

MR. BURSHTEYN: Yes, your Honor.

THE COURT: What is the distinction that you are drawing?

MR. BURSHTEYN: So, there is a difference in terms of the clarity and the ambiguity and just to make sure I understand the question, you are asking me to compare the release to the defendant with the transfer?

THE COURT: Well, maybe I can make it a little bit clearer. Just give me a second.

MR. BURSHTEYN: Absolutely.

(Pause)

THE COURT: So, the depositors who benefit from the $67 million that is returned, are those also the same people as the people whom you refer to as the account holders in paragraph 49?

MR. BURSHTEYN: Yes. The $67 million that was

N2O5eisA

1    returned was given back to the depositors or account holders --

2                THE COURT:  OK.

3                MR. BURSHTEYN:  -- to partially recover their assets.

4                THE COURT:  And are those all then the people who

5    voted for the proposal in paragraph 44?  Were those people all

6    people who were account holders or were they just the account

7    holders who held MNGO tokens in their accounts?

8                MR. BURSHTEYN:  Your Honor, you can only vote if you

9    hold MNGO tokens, so any vote for this proposal there may be

10   overlap with depositors but it is different.

11               THE COURT:  OK.  But again, that's the governance

12   provision.  In terms of the effect of the release in paragraph

13   44, the effect of it is to return the $67 million to all of the

14   account holders without regard to whether they held MNGO

15   tokens.

16               MR. BURSHTEYN:  That's right.  It hopped from the

17   treasury, so the money went to the DAO treasury and then the

18   treasury paid out the depositors.

19               THE COURT:  OK.  And are you representing that there

20   are in fact account holders who did not hold MNGO tokens?

21               MR. BURSHTEYN:  It's conceivable that every account

22   holder may have held MNGO tokens and we can submit evidence of

23   that to the Court, your Honor, but they would have had a mix

24   and so in terms of the loss they suffered, it would exceed just

25   the MNGO tokens and they would not have needed to vote for this

N2O5eisA

1    proposal to pass it -- for it to pass.

2              THE COURT:  Say that last bit?

3              MR. BURSHTEYN:  The vote doesn't require every Mango

4    token holder to vote, there is a certain threshold for votes to

5    pass as has been set by the DAO.  And so, you have a bunch of

6    depositors here that never waived any claims and then they

7    transferred them to Mango Labs.

8              THE COURT:  And those people have not returned --

9    nobody has tendered back to the defendant any of the proceeds

10   that they received that originated with the defendant but flow

11   through the treasury, correct?

12             MR. BURSHTEYN:  Yes, and like you said, we have gone

13   back and forth a bit where our position would be that it

14   originated from them.

15             THE COURT:  OK.  All right.  And I think you told me

16   that you haven't submitted any evidence on this particular

17   issue but in order to be an account holder, do you have to have

18   MNGO tokens or are there account holders who don't have MNGO

19   tokens?

20             MR. BURSHTEYN:  Your Honor, I would want to make a

21   fully accurate representation on the percentages and

22   requirements which we are able to do expeditiously.

23             THE COURT:  OK.  I think that that helps me understand

24   the distinctions that you are drawing.  Is there anything else

25   on that subject from the defendants?

N2O5eisA

1          MR. BERKOWITZ:  Your understanding is also that there

2    are account holders that can have a mix of funds, money, and to

3    the extent that there was a loss they were reimbursed by a

4    combination of the defendant returning funds and the DAO

5    treasury sort of filling any gap there.  Our understanding is

6    also that by having this, having a Mango account, you are

7    allowing this voting process to govern your rights as well.

8          THE COURT:  Why do you say that?  What should I look

9    at that would support that last proposition?

10         MR. BERKOWITZ:  It would be something in the terms of

11   service, it would be something that we could provide.  At the

12   end of the day this is sort of -- I feel like this discussion

13   is going to confirm this is about money damages and we are not

14   talking about any particular assets.

15         THE COURT:  Right.  All right.  Well, I will -- I am

16   prepared to receive any additional papers on this particular

17   issue but if I am going to give you a decision by the 10th I'm

18   going to need those papers pretty quickly.  It is now Friday,

19   would the parties be prepared by Tuesday to submit to me

20   supplemental papers?  And, I can describe a little bit more

21   what I have in mind.

22            Does that work for plaintiff?

23         MR. BURSHTEYN:  Yes, your Honor.

24         THE COURT:  For defendant?

25         MR. BERKOWITZ:  Sure, your Honor.

N2O5eisA

1      THE COURT:  What I have in mind is whatever evidence

2  exists with respect to the question of whether there are

3  account holders who don't have Mango tokens and whatever

4  evidence exists with respect to the terms of service, or

5  otherwise, that addresses the question of whether the

6  affirmative vote of a majority of the account holders or token

7  holders would bind every account holder.  In other words, the

8  plaintiff makes a point that Mango token holders is not

9  necessarily co-extensive with account holders and also makes a

10  point that the affirmative vote for the proposal would not

11  necessarily be effective with respect to account holders and

12  token holders who did not vote affirmatively.  Evidence with

13  respect to that issue would be helpful to me.  I don't know

14  whether it will, in the end, be relevant or dispositive, but it

15  helps fill out one of the open questions that I have got.  So,

16  Tuesday, by 5:00 p.m. competing declarations or evidence on

17  that subject.

18      Give me one moment?

19      (Pause)

20      THE COURT:  What I am going to do is I am prepared to

21  see the parties at 10:00 a.m. on March 10, and you can expect

22  at that point I will give you an opinion, decision from the

23  bench on the application for preliminary injunction.  In the

24  meantime, the TRO will continue to run.

25      Anything else from plaintiff?

N2O5eisA

1          MR. BURSHTEYN:  No, your Honor.  Thank you.

2          THE COURT:  Anything from defendant?

3          MR. BERKOWITZ:  No, your Honor.

4          THE COURT:  All right.  Have a good weekend,

5  everybody.  Thank you.

6          Thank you to the court reporter.

7          Will the parties please order a copy of the transcript

8  on an expedited basis?  You can share the cost.

9          MR. LAWRENCE:  We will, your Honor.

10          MR. BURSHTEYN:  Yes, your Honor.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25